AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Indiana

| United States of America | ) | |
|---|---|---|
| v. | ) | |
|  | ) | Case No. |
|  | ) | 1:21-mj-0727 |
|  | ) | |
| NATHAN CANARY | ) | |
|  | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __August 3, 2021__ in the county of __Marion__ in the __Southern__ District of __Indiana__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Mixture or Substance Containing a Detectable amount of Marijuana |
| 18 U.S.C. § 924(c) | Possession of a Firearm in Furtherance of a Drug Trafficking Offense |
| 18 U.S.C. § 922(g)(1) | Possession of a Firearm by a Previously Convicted Felon |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

/s/Luther A. Selby
*Complainant's signature*

Luther A. Selby, Special Agent, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by __telephone__ *(reliable electronic means)*

Date: 8/9/2021

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

City and state: Indianapolis, Indiana

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Luther Selby, U.S. Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am currently a Special Agent with ICE-HSI. I have been a Special Agent for almost 11 years and have over 12 years of law enforcement experience. During that time, I have served as a Special Agent for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and as a Reserve Deputy Sheriff for the Grant County Sheriff's Department in Grant County, Indiana. I obtained a Bachelor of Arts degree in Finance from Ball State University. I have also graduated from the Criminal Investigators Training Program (CITP), the Immigration and Customs Enforcement Special Agent Training (ICESAT), and the ATF Special Agent Basic Training (SABT) programs at the Federal Law Enforcement Training Center (FLETC) in Glynco, GA. I have previously been assigned to the ICE/HSI Assistant Special Agent in Charge, Harlingen, Texas, Rio Grande Valley Border Enforcement Security Task Force (RGV BEST). As well as the U.S. Marshal's Service Gulf Coast Violent Offenders and Fugitive Task Force. My present responsibilities include the investigation of violations of Title 8, 18, 19, 21, and 26 of the United States Code and related offenses. I have conducted and participated in numerous investigations violations of federal firearm and Immigration laws and have focused attention on the detection and apprehension of individuals violating both federal and state laws.

2.	The facts in this affidavit come from my personal observations, my training and experience, and from information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.	I make this affidavit in support of a criminal complaint. This complaint charges that Nathan CANARY possessed with intent to distribute marijuana in violation of Title 21, United States Code, Section 841(a)(1); possessed a firearm in furtherance of a drug trafficking crime in violation of Title 18, United States Code, Section 924(c); and possessed a firearm as a previously convicted felon in violation of Title 18, United States Code, Section 922(g)(1).

## INVESTIGATIVE SUMMARY

4.	At approximately 2:30 p.m. on August 3, 2021, members of the Homeland Security Investigations (HSI) Indianapolis Circle City Task Force (CCTF) received information from the Transportation Security Administration (TSA) regarding an individual who went thru the security checkpoint at the Indianapolis International Airport (IND) with a large amount of U.S. Currency (USC). TSA advised the individual was a male identified as Moshe HAIMOV (hereinafter, M.HAIMOV). TSA advised M.HAIMOV stated he and his brother were traveling with $80,000.00 USC. TSA advised that M.HAIMOV had the USC concealed in his backpack. TSA advised both were going to depart at 3:45 p.m. on Southwest Airlines flight #3692 for Ft. Lauderdale, FL and that it would be boarding at gate B21. TSA described M.HAIMOV as a white male wearing a gray Nike sweatshirt and blue jeans. TSA advised that M.HAIMOV stated he was a Jewelry Salesman and that he sold Jewelry to some "Pacers" (Indiana Pacers NBA basketball team). TFO Kyle Freeman, Resident Agent in

Charge (RAC) Daron Babcock, and Plainfield Police Department K9 Officer Mike Standiford along with certified narcotics K9 Axel responded to the airport to investigate.

5. RAC Babcock observed M.HAIMOV and a second individual (later identified as Levi HAIMOV, hereinafter L.HAIMOV) sitting near gate B21. Officer Standiford deployed K9 Axel for a free air sniff of individuals' bags in the general area near gate B21. K9 Axel alerted to the odor of a narcotic/controlled substance on the two carry-on bags on the floor near where M.HAIMOV and L.HAIMOV were sitting.

6. TFO Freeman then approached both individuals and initiated a consensual encounter. TFO Freeman identified himself as Law Enforcement and asked to speak with both individuals away from other passengers. Both M.HAIMOV and L.HAIMOV consented to the request. TFO Freeman asked M.HAIMOV if he had an issue at TSA. M.HAIMOV stated no. TFO Freeman then asked M.HAIMOV if he was traveling with a large amount of US Currency. M.HAIMOV then stated he was flying with a large amount of USC.

7. M.HAIMOV stated that he came into town from Miami, FL earlier in the morning to conduct business. M.HAIMOV stated that he was a Jewelry Dealer and sold some jewelry to an individual. M.HAIMOV stated he did not know the individual. M.HAIMOV then stated he knew the customer as "Nate." M.HAIMOV stated he could not remember what he sold "Nate" and could not provide any receipt or records pertaining to the jewelry that was sold. M.HAIMOV could not provide the exact amount of USC he was traveling with or exactly what he sold to "Nate" and for how much. TFO Freeman then asked for consent to search M.HAIMOV's belongings and take a look at his cell phone text messages pertaining to the jewelry transaction. M.HAIMOV granted consent for TFO Freeman to search his carry-

on backpack and go through his cell phone, which consisted of a text string with a "Nate Wale" who was the person M.HAIMOV stated he had sold jewelry to earlier in the day.

8. While TFO Freeman was speaking with M.HAIMOV, HSI Indianapolis RAC Daron Babcock initiated a consensual encounter with L.HAIMOV. L.HAIMOV advised he flew to IND with his brother to conduct a jewelry transaction, stated they had left Miami International Airport earlier in the day at approximately 8:30 a.m., and had stayed together the entire time they were in Indianapolis. L.HAIMOV granted verbal permission for law enforcement to search his gray backpack following a positive K9 alert for the odor of narcotics/controlled substances, but nothing illegal was located inside the backpack. RAC Babcock asked clarifying questions of L.HAIMOV, but he was unable to provide any details about the reason for the trip to IND, who the jewelry transaction had taken place with, and advised his brother (M.HAIMOV) was the person who brought the jewelry and conducted the transaction.

9. TFO Freeman then located multiple rubber-banded stacks of U.S. Currency inside of M.HAIMOV's multi-colored backpack along with a small amount of jewelry. There were also a few items of clothing inside the backpack as well. TFO Freeman reviewed M.HAIMOV's text string with "Nate Wale" and observed a video recording of a marijuana grow operation.

10. In addition, TFO Freeman saw a text message from M.HAIMOV to "Nate Wale" asking for "Nate Wale's" address. "Nate Wale" replied with a text message which read, "6471 creekside lane 46220" and a follow-up message which stated, "My house". RAC Babcock then asked M.HAIMOV if the address in the text string was where the jewelry transaction took place, and he responded that he and his brother took an Uber to the 6471

Creekside Lane residence and met with "Nate Wale." M.HAIMOV stated "Nate Wale" brought the money out of the residence and paid him for jewelry but was unable to state definitively what type of jewelry was sold and for how much. When asked if he had a receipt for the transaction, M.HAIMOV advised the receipt was at his business in Miami, FL. When asked if his company had an online website, M.HAIMOV pulled up a website for "Haimov Jewelers" but was unable to explain why he needed to travel to Indianapolis to complete a jewelry transaction and pick-up U.S. Currency when customers could purchase items directly from the company online.

11. TFO Freeman then advised M.HAIMOV the money was being seized for federal violations of 18 USC 981 and 21 USC 881 as proceeds related to illegal narcotics trafficking and money laundering based on the marijuana grow video on his cell phone, the positive K9 alert on the backpack containing the USC, and the implausible story about selling an unknown type of jewelry for an unknown amount of money during a short layover stay in Indianapolis. M.HAIMOV was then provided an HSI Receipt for Property and both he and his brother L.HAIMOV subsequently boarded their flight for Ft. Lauderdale, FL.

12. TFO Freeman, Officer Standiford, and RAC Babcock then took the seized USC to the CBP International Arrivals area at IND. Officer Standiford then walked K9 Axel around the area with no positive alerts to the odor of narcotics. RAC Babcock then concealed the USC in the area and when K9 Axel walked through the area again he located the bag containing the USC and positively alerted to the odor of narcotics/controlled substances on the bag. A PAD aerosol test was then conducted on the USC, and the results were positive for trace amounts of marijuana on the seized USC. The test is performed by taking a PAD and rubbing it on the US Currency and spraying an Aerosol Chemical onto a PAD. The PAD

then turns a color indicating the presence of controlled substances. In this instance the PAD turned red indicating the presence of Marijuana. The seized USC was then sealed in an evidence bag and initialed. The USC was later bank counted for a total of $149,020.00.

13. Law enforcement database queries for the residential address of "Nate Wale" came back associated to Nathan CANARY, a marijuana trafficker well-known to law enforcement officers in the Indianapolis, IN area. Criminal history checks for CANARY revealed a federal conviction from November 2008 for violations of 21 USC 846, Conspiracy to Distribute 100 Kilograms or More of Marijuana in the Western District of New York. CANARY received a sentence of 18 months imprisonment in the federal Bureau of Prisons. In addition, CANARY had a state felony conviction in October 2017 for marijuana possession and dealing marijuana. HSI Indianapolis Task Force Officers also seized approximately $5,000 in suspected narcotics proceeds from CANARY during October 2019 at the Indianapolis International Airport. In addition to criminal records checks, a query of CANARY's current Indiana driver's license shows the address on Creekside Lane, Indianapolis, IN 46220 as his home of record.

14. At approximately 10:25 p.m. on August 3, 2021, SAs and Officers executed a state search warrant for CANARY's residence located on Creekside Lane, Indianapolis, IN 46220. Nathan CANARY and his brother Ben Canary were located inside the residence at the time the search warrant was executed.

15. During the execution of the search warrant at CANARY's house, HSI SA Selby and HSI TFO Freeman conducted a custodial interview of Nathan CANARY. N.CANARY was read his Miranda Rights by officers on the scene. N.CANARY stated he understood his rights and was willing to waive his rights in an effort to discuss the reason

why law enforcement officers had executed a search warrant on his property. N.CANARY stated he had received a phone call from his jeweler regarding the incident that occurred earlier in the day at the Indianapolis International Airport regarding the seizure of a large amount of U.S. Currency. N.CANARY stated the HAIMOV brothers were at his residence to not only sell jewelry, but to also collect money from N.CANARY to pay for a debt on a necklace. N.CANARY stated he gave the HAIMOV brothers a partial debt payment. N.CANARY stated the HAIMOV brothers were also at his house to sell jewelry to others but would not elaborate on who else was at his house by stating, "you are asking me to rat other people out." N.CANARY stated he had been conducting business with HAIMOV Jewelers for 5 to 6 years.

16. N.CANARY stated he did not give the HAIMOV brothers all the money that was seized earlier in the day by law enforcement officials. N.CANARY stated the HAIMOV brothers arrived at his house with a large amount of money in their bag. N.CANARY did not want to specify the amount of money he gave to the HAIMOV brothers.

17. N.CANARY stated he makes between $300,000.00 and $400,000.00 a year. N.CANARY stated he is the co-owner of Herculean Meal Prep with his brother Ben Canary. N.CANARY stated he is also involved in real estate investments. N.CANARY stated he had not filed taxes in several years but does have an extension from the IRS.

18. N.CANARY stated he is currently involved in Marijuana related business venture. N.CANARY acknowledged he has yet to obtain a lawful permit from any of the states where marijuana has been legalized.

19. N.CANARY stated he knew he was a previously convicted felon, and understood that as such he was prohibited from possessing firearms/ammunition.

N.CANARY acknowledged it might be possible that his DNA would be present on the firearms law enforcement personnel retrieved from his residence. N.CANARY did not state who the firearms belonged to.

20.     HSI SA Selby and HSI TFO Freeman then interviewed Ben Canary. B.Canary was advised of his Miranda Rights and acknowledged he understood his rights. B.Canary stated he did not live at the Creekside Lane residence. B.Canary stated he did not have a room in the residence with any of his possessions. B.Canary then requested an attorney be present before any further questions were asked.

21.     During the search of the residence SAs and Officers located the following items throughout the residence:

* Sig Sauer P938, S/N: 5213094913, 9MM, pistol – Master Bedroom

* Glock 17, S/N: NONE, 9MM, pistol – Master Bedroom

* Benelli Nova pump action shotgun, S/N: Z744367Y14, 12 Gauge – Garage

* Wolf Magnum, .50 Caliber, S/N: 61-13-011919-07, rifle – Basement

* 12 gauge shotgun shells (208 total) – Office

* 30-06 rounds (179 total) – Office

* 30 caliber rounds (49 total) – Office

* 30-30 rounds (4 total) – Office

* Smith and Wesson .40 caliber pistol magazine containing 3 live rounds - Office

* approximately 610.1 grams of marijuana

* approximately 1.02 kilograms of marijuana THC wax

* approximately 62 marijuana THC vape cartridges

* approximately 11 oxycodone pills

* approximately 13 amphetamine pills

* approximately 548 grams of marijuana THC wax in jars

* approximately 478.1 grams of various steroids

* approximately 344.7 grams of marijuana THC edibles

* a commercial grade money counter

* digital scales

* various smoking pipes/apparatus

* vacuum sealing equipment

* a total of $93,293 in U.S. Currency

* multiple drug ledgers

* six cellular phones

Each of the firearms with the exception of the Glock 17, seized from CANARY's residence were manufactured outside the State of Indiana. At this time, I do not know where the Glock 17 was manufactured. The Glock 17 was found to contain 22 live rounds in the magazine that was inserted into the pistol. The Sig Sauer P938 was found to contain 5 live rounds in the magazine that was inserted into the pistol. No firearms were found to contain a live round in their respective chambers.

Analysis of Documents

22. During the search of the room deemed CANARY's office law enforcement located and seized numerous documents as evidence of distribution of marijuana. These documents included printed out invoices, notebooks utilized as ledgers, handwritten ledgers on sticky notes, shipping manifest documents, manilla files containing customer orders of quantities of marijuana and THC products, and sales order invoices from a marijuana contract

manufacturing co-packing and distribution company. This room also contained two large dry erase boards with nicknames and initials of individuals with quantities of money owed, money paid, and or quantities of marijuana and marijuana products ordered.

23. In this same room (the office), officers recovered a portion of the $93,233 of U.S. Currency seized from the house. Some of this currency found in the office was packaged in vacuum sealed rubber banded stacks. From my training and experience, this is consistent with the packaging of drug proceeds.

24. Other agents and I have begun to analyze the documents seized from the office; these documents appear to detail an extensive marijuana distribution operation. Specifically, there are invoices that show the name of the strain of marijuana, price per unit (term commonly utilized referencing one pound), quantity of units ordered, total price of product, previous customer balance, total before payments, and payments. From my training and experience, these documents evidence that CANARY was distributing marijuana, Butane Hash Oil (commonly referred to as wax and or shatter) THC vape cartridges, and THC edibles.

25. There was an invoice in the name of "Shirts" that showed 54 different strains or flavors of marijuana ordered totaling 569.5 pounds. The total balance of this order was $1,030,200. Previous balance showed $66,800 owed for a total balance before payments of $1,097,000. The document showed payments of $139,000; $240,000; $130,000; $51,000; $100,000; and $2,200. Another document seized also showed "Shirts" made a payment of $100,000 in June, as shown on the original invoice.

26. Multiple other invoices were recovered showing large quantities of marijuana and marijuana products delivered, with large quantities of money paid and owed.

27. A piece of notebook paper recovered was titled "Flower Inventory." Through my training and experience, I am aware that the term "Flower" is used to reference actual marijuana buds. This inventory ledger showed 16 different strains of marijuana with numbers alongside the names. I believe these numbers represent the total number of pounds of each strain available to CANARY at the time ledger was written. The total represented was 537 pounds.

28. A document titled "Payments + Expenses" outlined money coming in and out of CANARY's marijuana distribution operation. A portion of the document read: "we flew out with-$370,189; $507,000; $280,545; and $1,000,000." I believe this notation shows cash profits that CANARY transported on an airplane from Indianapolis, Indiana to California.

29. A customer ledger for "Indi Jones" showed strains of marijuana, butane hash oil, THC gummies, and other edibles ordered.

30. Multiple invoices were found titled "Lets Get It Entertainment." Some of these invoices contained nicknames of the individual customers. One of the customers was identified from the documents under the name "Chi." This is believed to be an individual that CANARY supplies who lives in Chicago Illinois.

31. Shipping Manifests were seized from CANARY's office detailing the quantities and strains of marijuana, THC edibles and butane hash oil contained in the shipment. One such manifest seized titled "Manifest by Crate 6-23-2021" showed the following quantities of marijuana products shipped by indicating "Box #, :"Strain", and "Count" per Crate, as follows:

Crate 1 showed 16 boxes of approximately 274lbs of marijuana

Crate 2 showed 27 boxes of approximately 278lbs of marijuana

      Crate 3 showed 16 boxes of approximately 245lbs of marijuana

      Crate 4 showed 34 boxes of Edibles

      Crate 5 showed 6 coolers of "WC Shatter," which indicated West Coast Shatter (butane hash oil)

      Crate 6 showed 54 boxes of Chocolates (200 per box)

      Crate 7 showed 54 boxes of Chocolates (200 per box)

      Crate 8 showed 32 boxes of Gummies (250 per box)

Other manifests recovered were dated 9/13/2020, 9/16, 10/2, and 6/17/2021.

<u>Use of Firearms and Other Items in Large Scale Drug Trafficking</u>

      32.    From my training and experience in narcotics enforcement, I know that drug traffickers utilize digital scales and vacuum sealing equipment in furtherance of drug trafficking, as these items assist in weighing and packaging their product. I am aware that large scale drug traffickers keep ledgers of the sort found in CANARY's home, in order to keep drugs and outstanding drug debts straight. I am aware that the amount of marijuana seized from CANARY's residence, as described above, was suitable for and commensurate with distribution, not with personal consumption. Furthermore, I know that drug traffickers possess firearms in order to protect their drugs and their drug proceeds.

## **CONCLUSION**

      33.    Based on the above paragraphs, I respectfully submit that there is probable cause to believe that Nathan CANARY committed the following violations of federal law: possession with intent to distribute a mixture or substance containing a detectable amount of

marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1); possession of a firearm in furtherance of a drug trafficking crime in violation of Title 18, United States Code, Section 924(c); and possession of a firearm as a previously convicted felon in violation of Title 18, United States Code, Section 922(g)(1).

FURTHER AFFIANT SAYETH NOT.

    /s/ Luther Selby
Luther Selby
ICE-HSI Special Agent

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by telephone.

8/9/2021



Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana