UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

```
UNITED STATES OF AMERICA,        )
                                 )
              Plaintiff,         ) CAUSE NO.:
                                 ) 1:21-CR-0243-JPH/DML-01
                                 ) Indianapolis, Indiana
         -v-                     ) August 24th, 2021
                                 ) 2:30 p.m.
NATHAN CANARY,                   )
                                 )
              Defendant.         )
```

**Before the Honorable**
**PAUL R. CHERRY, MAGISTRATE**

OFFICIAL TRANSCRIBER'S TRANSCRIPT OF
INITIAL APPEARANCE AND DETENTION HEARING

**For Government:**      Michelle Brady, Esq.
                         Assistant U.S. Attorney
                         United States Attorney's Office
                         10 West Market Street
                         Suite 2100
                         Indianapolis, IN  46204

**For Defendant:**       Joshua Moudy, Esq.
                         KAMMEN & MOUDY
                         135 N. Pennsylvania Street
                         Suite 1175
                         Indianapolis, IN  46204

**Court Transcriber:**   Laura Howie-Walters, FCRR, CSR, RPR
                         Official Court Reporter
                         United States District Court
                         46 E. Ohio Street
                         Room 217
                         Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

## I N D E X   O F   E X A M I N A T I O N

LUTHER SELBY

Direct Examination by Ms. Brady ................12
Cross-examination by Mr. Moudy .................29

## I N D E X   O F   E X H I B I T S

Government's Exhibit No.:

1.......................... 14
2.......................... 15

1                        (Open court.)

2              THE COURT:  This is the case of the United States of

3    America versus Nathan -- how is your last name pronounced?

4              THE DEFENDANT:  Canary, sir.

5              THE COURT:  -- Canary, 1:21-cr-243.  Today's date is

6    August 24th, 2021.

7              Participating in this court hearing in the courtroom

8    is the defendant, Mr. Canary; his attorney, Joshua Moudy; the

9    government's attorney, Assistant United States Attorney

10   Michelle Brady; and United States Probation Officer, Alison

11   Upchurch.

12             We're scheduled today for an initial appearance

13   followed by a detention hearing.  The case began by the filing

14   of a criminal complaint.  After that, on August 18, 2021, an

15   indictment was filed.  So we'll begin with the initial

16   appearance on the indictment.

17             Mr. Canary, the purposes of this initial appearance

18   that we're starting now are to inform you of the charges

19   against you in the indictment, inform you of the maximum

20   possible penalties you face if you are convicted, inform you of

21   your legal rights and give you some other information.  The

22   court hearing today is not a trial.

23             Do you understand the purposes of this court hearing?

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  During this hearing, you have the right to

4

remain silent.  That is, both hearings, because we're going to
follow this with a detention hearing.  You are not required to
say anything at all during these hearings if you don't want to.
These hearings are being recorded.  Anything you say during
these hearings can and probably would be used against you later
by the government if possible.

I will ask you some more questions during this hearing
in court.  You don't have to answer any of my questions.  If
you don't want to answer a question, just tell me that.  If you
would like to speak privately with your lawyer during this
hearing, you can do so, or the detention hearing as well of
course by whispering.  None the rest of us will listen.

Do you understand this information about your right to
remain silent?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  I'd like to confirm for the recording, are
you Nathan Canary?

THE DEFENDANT:  I am, Your Honor.

THE COURT:  What is your date of birth?

THE DEFENDANT:  ██████████.

THE COURT:  Are you a United States citizen?

THE DEFENDANT:  I am.

THE COURT:  Have you put any alcohol, legal drugs or
illegal drugs into your body yesterday or today?

THE DEFENDANT:  No, Your Honor.

1            THE COURT:  Do you have any physical condition or

2    mental condition that might make it hard for you to understand

3    these court proceedings?

4            THE DEFENDANT:  No, Your Honor.

5            THE COURT:  The charges against you now are in a

6    document called an "indictment."  The indictment replaces the

7    criminal complaint.  In the indictment, the government is

8    alleging you have committed three felony crimes.  Have you

9    received a copy of the indictment?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  Have you read it?

12           THE DEFENDANT:  We have gone through it, yes.

13           THE COURT:  So you've talked about it with one or both

14   of your lawyers?

15           THE DEFENDANT:  Yes, Your Honor.

16           THE COURT:  I'm going to summarize the three charges

17   for you.  The Count 1 charges alleges possession of a

18   controlled substance with intent to distribute it, and that is

19   marijuana.  That's in violation of Title 18 -- I'm sorry, Title

20   21, United States Code, Section 841(a)(1).  The Count 2 charge

21   alleges possession of a firearm in furtherance of a

22   drug-trafficking crime.  That's in violation of Title 18,

23   United States Code, Section 924(c).

24           The Count 3 charge alleges possession of a firearm as

25   a previously-convicted felon.  That's in violation of Title 18,

United States Code, Section 922(g)(1).

Do you understand the three charges against you in the indictment?

THE DEFENDANT:  I do understand.

THE COURT:  Would you like for me to read the indictment to you right now out loud?

THE DEFENDANT:  No, Your Honor, that is fine.  Thank you.

THE COURT:  If you are eventually convicted of these charges, the sentencing judge could sentence you as follows:  for the Count 1 charge, possession of marijuana with intent to distribute, the sentencing judge could sentence to you a period of imprisonment for a minimum of zero days up to a maximum of five years, could fine you any amount of money up to $250,000, and could place you on supervised release for at least two years or more.

If you're convicted of the Count 2 charge, that's the possession of a firearm in furtherance of a drug-trafficking offense charge, the sentencing judge must sentence you to a minimum of five years' imprisonment up to a maximum of life imprisonment, could fine you any amount of money up to $250,000, and could place you on supervised release for any period of time up to five years.

If you're convicted in Count 3, that's the possession of a firearm by a previously-convicted felon charge, a

sentencing judge could sentence you to a period of imprisonment between a minimum of zero days up to a maximum of ten years, could fine you any amount of money up to $250,000, and could place you on supervised release for an amount of time up to three years.

Do you think you understand those maximum possible penalties and minimum required penalties you face if you are convicted in this case?

THE DEFENDANT:  Yes, Your Honor.  It seems pretty clear.

THE COURT:  Do you have any questions you would like to ask me right now about the charges or about the possible penalties?

THE DEFENDANT:  Not at this time, thank you.

THE COURT:  Next I want to tell you about important legal rights you have in this case.  You have the right to a public trial, a speedy trial and a jury trial, or a trial to a judge with no jury if you choose.

For the trial, you have the right to use the power of the court to issue subpoenas to bring to court evidence in your favor and witnesses in your favor.  At trial, you have the right to see, hear, confront and cross-examine all witnesses who testify for the government against you.  You have the right to have a lawyer help you at every stage in this case.  You have the right to require the United States government to prove

1    the charges in court at a trial beyond a reasonable doubt.

2           At trial, you cannot be required to testify against

3    yourself or even to testify at all.  If you are convicted at

4    trial, then you would have the right to appeal your convictions

5    and sentences to the United States Court of Appeals.

6           Do you think you understand those important legal

7    rights that you have?

8                THE DEFENDANT:  Yes, Your Honor.  Thank you.

9                THE COURT:  Mr. Moudy, do you and your client want a

10   formal arraignment or do you waive the formal arraignment?

11               MR. MOUDY:  We'll waive the formal arraignment, Your

12   Honor.

13               THE COURT:  Do you agree with that, Mr. Canary?

14               THE DEFENDANT:  Yes, Your Honor.  Thank you.

15               THE COURT:  You've waived a right to a formal

16   arraignment.  I now enter pleas of not guilty on behalf of

17   Mr. Canary to the three charges in the indictment.

18           As required by Federal Criminal Rule 5(f), the United

19   States is ordered to produce all exculpatory evidence to the

20   defendant pursuant to the case of Brady versus Maryland and its

21   progeny.  Not doing so in a timely manner may result in

22   sanctions, including exclusion of evidence, adverse jury

23   instructions, dismissal of charges, contempt proceedings, or

24   sanctions by the Court.

25           The discovery disclosure deadline in this case is

September 7, 2021.  I remind you all that the trial date presently is scheduled to begin October 25, 2021.

That concludes the initial appearance.  So now we turn our attention to the detention hearing and begin it.

Mr. Canary, the purpose of this detention hearing is for me to decide if there's any condition or combination of conditions that will reasonably assure your appearance in court as required and assure the safety of any other person or the safety of the community in general.

Do you think you understand the purposes of the detention hearing?

THE DEFENDANT:  I do, Your Honor.  Thank you.

THE COURT:  Have you talked with your lawyer in general or more than in general, either way, about the detention hearing?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  I will consider several factors when I make the detention decision.  Some of the factors that I will consider include the nature and circumstances of the charges in this case; also, the weight of the evidence against you; also, your history and characteristics, including criminal history; also whether you were on probation, parole, bond or other court supervision for another offense at the time the allegations currently against you in this indictment are alleged to have occurred or now; and also, the nature and seriousness of the

danger to any person or to the community in general that would
be posed by your release.

Do you understand those are some of the factors that I
consider today in making the detention decision?

THE DEFENDANT:  Yes, Your Honor.  Thank you.

THE COURT:  You have several important legal rights
for this detention hearing.  They include the right to be
represented by a lawyer, the right to testify today on your own
behalf if you want to, the right to not testify today if you
don't want to, the right to call witnesses to testify in your
favor today if there are any, the right to cross-examine any
witnesses the government may call to testify in this hearing,
the right to present information to the court through your
lawyer and/or formal evidence or both, and the right to remain
silent and all I told but that a few minutes ago.

Do you think you understand these rights you have at
the detention hearing?

THE DEFENDANT:  I do, sir, Your Honor.  Thank you.

THE COURT:  There was a pretrial services report
filed, a PS3 report.

Miss Brady, did the government receive a copy?

MS. BRADY:  I did, Your Honor.

THE COURT:  Mr. Moudy, did you receive a copy?

MR. MOUDY:  I did, Your Honor, and I went through it
with Nathan.

1          THE COURT:  Are you aware of any incorrect information

2     in there?

3          MR. MOUDY:  I am not.

4          THE COURT:  All right.  That's fine.

5          We'll now proceed with the detention hearing.  And

6     each side will have the opportunity to present evidence

7     followed by the opportunity to present arguments.  I will and

8     do now consider as evidence already now for the purposes of

9     this hearing the contents of the criminal complaint, the

10    contents of the affidavit that supports the criminal complaint,

11    the contents of the indictment, and the contents of the

12    pretrial services report.

13         Does the statutory presumption of detention apply in

14    this case, Ms. Brady?

15         MS. BRADY:  It does, Your Honor.  Pursuant to 18 U.S.

16    Code 3142(e)(3)(b), there is a presumption in favor of

17    detention.

18         THE COURT:  Thank you.  Ms. Brady, you may present

19    evidence either formally or proffer or both.

20         MS. BRADY:  Yes, Your Honor.  The United States would

21    call Agent Selby to the stand.

22         THE COURT:  Sir, do you swear or affirm to tell the

23    truth, the whole truth and nothing but the truth, so help you

24    God?

25         THE WITNESS:  I do.

1    MS. BRADY:  Thank you, Your Honor.

2    **LUTHER SELBY, PLAINTIFF'S WITNESS, SWORN**

3    **DIRECT EXAMINATION**

4    BY MS. BRADY:

5    Q.  Once you're seated there, if you would, please state your

6    full name for the record.

7    A.  Luther Selby.  Last name is spelled S-E-L, B as in boy, Y.

8    Q.  Sir, how are you employed?

9    A.  I'm a Special Agent with the Department of Homeland

10   Security, Homeland Security Investigations or HSI.

11   Q.  How long have you been an agent with HSI?

12   A.  Since 2010.

13   Q.  And what did you do before that?

14   A.  I was an ATF agent, and then before that an HSI agent.

15   Q.  Okay.  Have you received training in narcotics

16   investigations?

17   A.  I have.

18   Q.  Very briefly, could you summarize a little bit of what

19   training you received in narcotics investigations?

20   A.  I attended numerous seminars and then including our HSI

21   Academy, which covers narcotics rather extensively, narcotics

22   investigations rather extensively.

23   Q.  Do you have -- is it correct that as an ATF agent, you

24   received training in firearms investigation?

25   A.  Yes.

1  Q.  And have you received any training or background in

2  financial investigations?

3  A.  Yes, I have.

4  Q.  Was that with ATF or HSI?

5  A.  Primarily with HSI.

6  Q.  Are you familiar with the facts and circumstances that led

7  to the defendant's arrest on August 3rd of 2021?

8  A.  Yes.

9  Q.  Were you involved in that, the events of August 3rd, 2021?

10  A.  Yes, I have.

11  Q.  Have you continued in the investigation since that date?

12  A.  Yes.

13  Q.  In fact, were you the affiant on the complaint that is part

14  of this record?

15  A.  Yes, I was.

16  Q.  You are familiar with the application for seizure warrants

17  that was filed on August 22nd, 2021, that was submitted to the

18  court today under Docket 26?

19  A.  Yes.

20  Q.  Are you the affiant on that affidavit as well?

21  A.  Yes, I am.

22       MS. BRADY:  Your Honor, I would ask that the

23  application and affidavit for seizure warrants that is part of

24  the court record at Docket 26 be made part of this record as

25  Exhibit 1, a copy of which has been previously provided for

1  defense counsel.

2         THE COURT:  Any objection?

3               (Off the record.)

4         MR. MOUDY:  No objection, Your Honor.

5         THE COURT:  Exhibit 1 is admitted into evidence for

6  purposes of this hearing.

7               (Plaintiff's Exhibit 1 received in evidence.)

8         MS. BRADY:  Thank you, Your Honor.

9  BY MS. BRADY:

10  Q.  You indicated you were part of the August 3rd event.  Were

11  you present at execution of a search warrant that occurred at

12  ███████████████████████  on that day?

13  A.  Yes.

14  Q.  Did you assist in the execution of that search warrant?

15  A.  Yes, I did.

16  Q.  I believe in front of you is what's been marked for

17  identification as Government Exhibit 2; is that correct?

18  A.  Yes.

19  Q.  Are you familiar with each of the pages that are contained

20  in Government's Exhibit 2 for identification?

21  A.  Yes, I am.

22  Q.  Do each of the exhibit -- I'm sorry, each of the documents

23  in Exhibit 2, do they contain either a photograph of or a xerox

24  copy of evidence and things that you personally observed at the

25  Creekside Lane residence on August 3rd, 2021?

1   A.  Yes.

2   Q.  Do each of these pages fairly and accurately reflect those

3   items that you personally observed that day?

4   A.  Yes.

5           MS. BRADY:  Your Honor, I would move to admit

6   Government's Exhibit 2.

7           MR. MOUDY:  No objection, Your Honor.

8           THE COURT:  Exhibit 2 is admitted for purposes of this

9   hearing.

10          (Plaintiff's Exhibit 2 received in evidence.)

11          MS. BRADY:  May I approach?

12          THE COURT:  Please.  Thank you.

13  BY MS. BRADY:

14  Q.  Before we talk about the contents of Exhibit 2, through

15  your involvement in the investigation, as of early August,

16  2021, who was living at ████████████████████?

17  A.  Nathan Canary.

18  Q.  Why do -- how did you come to that conclusion?

19  A.  Based on evidence recovered and then also in interviewing

20  Mr. Canary.

21  Q.  First, you said based on evidence recovered, what do you

22  mean by that?

23  A.  We were recovered numerous documents, for example, loan

24  documents, bank statements, that had his name and address on

25  them or -- and also old identifications from the state of

1  Indiana, for example a state ID was located in the residence as

2  well.

3  Q.  You indicated also there was an interview that was

4  conducted with Mr. Canary on August 3rd; is that correct?

5  A.  Yes.

6  Q.  Were you present for that interview?

7  A.  Yes.

8  Q.  Did that interview occur after Mr. Canary was informed of

9  and waived his Miranda rights?

10  A.  Yes.

11  Q.  What about that statement led you to conclude that as of

12  early August 2021, Mr. Canary was living at the Creekside Lane

13  residence?

14  A.  During the interview, I asked Mr. Canary in particular

15  about his filing status for his taxes, in which state he would

16  be filing taxes in, and he stated he would be filing taxes in

17  Indiana.  He stated he also had another residence, a secondary

18  residence in California, but would claim Indiana as his primary

19  residence --

20  Q.  Did --

21  A.  -- state of --

22  Q.  I'm sorry?

23  A.  As his state of residency.

24  Q.  He indicated that he did have a secondary residence in

25  California?

1   A.   Yes.

2   Q.   Looking at the PS3, there's a residence listed, ▊▊▊▊

3   ▊▊▊▊▊▊▊▊ in Newport Beach.  Are you familiar with that

4   property?

5   A.   Yes.

6   Q.   Have you -- at this point in your investigation, have you

7   learned anything about that property?

8   A.   Yes.

9   Q.   What?

10  A.   We seized five vehicles from that property, that were

11  registered to Mr. Canary, yesterday.

12  Q.   Okay.  And what about the vehicles is relevant to the

13  Cyprus residence?  From that specific --

14  A.   Umm.

15  Q.   -- property, I'm sorry or am

16  A.   They were seized --

17  Q.   -- I missing --

18  A.   They were received from that specific property.

19  Q.   And I apologize.  I think I misunderstood.

20       Are these vehicles that are referenced in your affidavit,

21  Exhibit 1?

22  A.   Yes.

23  Q.   Okay.  Have you at this point in the investigation

24  determined the ownership of that property?

25  A.   No, I have not.

Q.  No reason to believe that he does not have at least a
secondary residence in that California residence, correct?

A.  Correct.

Q.  Okay.  Let me, if I could, return back to the Creekside
Lane search warrant executed August 3rd, 2021.  Were you in the
office of the house that day, August 3rd?

A.  Yes.

Q.  Were a number of documents seized from the office of the
house?

A.  Yes.

Q.  Have you personally gone through each of those documents?

A.  Not each single one, but a good majority.

Q.  You've gone through a substantial number of those
documents?

A.  Yes.

Q.  Okay.  Through your investigation today, as well as your
training and experience, did any of those documents relate to
marijuana trafficking?

A.  Yes, they did.

Q.  Okay.  If I could now invite your attention to page 1 of
the Government's Exhibit 2., I'd ask you, what are we looking
at?

A.  This is what, based on my training and experience, would be
considered a drug ledger or an invoice for the purchase and
sale of narcotics.

Q.   This -- it appears to be a two-page document; is that
correct?

A.   That's correct.

Q.   This particular document was seized from the defendant's
home on August 3rd?

A.   Yes.

Q.   Can you, using your training and experience as well as
specifically your involvement in the investigation, walk us
through what are these various columns that we're looking at?

A.   Yes.  So the top is titled "load," which would, based on my
training and experience, indicate drug shipment, commonly
referred to as a load.

     The strain would be the first column on the left which
would be the type of narcotic.  In this particular case, it
would be a type of strain of marijuana or marijuana-based
product.

Q.   Let me ask you first:  What do you mean by "marijuana
strains"?

A.   Marijuana currently has numerous types of strains,
different potency levels, also some people consider them
different quality or grade of marijuana.

Q.   Looking at briefly just the first row, the "shatter?"  What
is "shatter"?

A.   Shatter is a high potency form of marijuana, THC-based
product that is in a crystalline form or glass-like substance

1    that can be broken or cracked or shattered.

2    Q.  Okay.  So then moving down to the next columns?

3    A.  The next column would be the number of units.  In this

4    particular case, based on my training and experience, I view

5    that as a number of pounds per described drug; then the cost

6    per, which would be the cost per pound; the sale price.  And

7    then the dollar amount of profit per pound in the following

8    column, followed by a total cost of the row, and then a total

9    profit of the row.

10   Q.  So looking again, keeping at this first row with the

11   shatter, that high-potency marijuana you talked about, through

12   your training and experience, what would -- here in Indiana,

13   for example, at the current time, what would one expect to pay

14   for a pound of shatter marijuana?

15   A.  It has a broad range based on the quality, but I would say

16   that anywhere between three to $5,000 a pound.

17   Q.  So you indicated you have started to review -- actually let

18   me first back up.

19       This first document contained in Government's Exhibit 2,

20   was this demonstrative?  Was this the only such ledger or

21   document that you seized from the home on August 3rd?

22   A.  No.

23   Q.  Is this first and second page of Government's Exhibit 2

24   representative of what several different spreadsheets or

25   invoices look like?

1    A.  Yes.

2    Q.  Have you started analyzing these invoices?  I know you

3    indicated you've reviewed them.  Have you started analyzing the

4    contents of these invoices that were seized August 3rd?

5    A.  Yes, I have.

6    Q.  Based -- have you completed that analysis?

7    A.  Not yet.

8    Q.  Okay.  So based on the analysis that you have conducted so

9    far of these various spreadsheets that were seized, how much

10   weight of marijuana, the various strains, are reflected in the

11   invoices that you have analyzed so far?

12   A.  So far, it's been in excess of 2,000 pounds.

13   Q.  Have you been able to calculate by your analysis of these

14   documents the total sales reflected in the invoices that you've

15   have gone through in terms of price?

16   A.  Yes.

17   Q.  What have you found so far through your initial analysis?

18   A.  Total sales have exceeded 6.2 million.

19   Q.  Have you determined the amount of profit?  I mean,

20   obviously there's cost to doing business.  Is there a way and

21   have you started to analyze the estimated profit from these

22   various documents?

23   A.  Yes.

24   Q.  What have you found so far?

25   A.  So far, we're approaching -- we're in excess of 1 million

1    and approaching $2 million in profit.

2    Q.  Did you assist not just in the office but in the other

3    rooms of the residence?

4    A.  Yes.

5    Q.  Just turning to -- we've looked now at page 1 and page 2.

6    Can you flip to the next page?  What are we looking at there?

7            THE COURT:  For the record, still looking at

8    Exhibit 2.

9            MS. BRADY:  Thank you, Your Honor.  I'm sorry.

10   A.  We're looking at a picture of two firearms, specifically

11   two pistols that were found in the master bedroom of the

12   residence.

13   BY MS. BRADY:

14   Q.  Both loaded?

15   A.  Yes.

16   Q.  Okay.  The complaint indicates there were a total of four

17   firearms seized from the home.  These were the only two in the

18   bedroom; is that correct?

19   A.  That's correct.

20   Q.  Are these the two that are set forth in the indictment,

21   alleged violation of 18 U.S. Code 924(c)?

22   A.  Yes.

23   Q.  If you could flip to the next page on Government's

24   Exhibit 2.  What are we looking at?

25   A.  That is what we would consider an ammo can or an ammo

canister.  It is what is designed to store a large amount of ammunition.

Q.  And what caliber is that ammunition, if you know?

A.  The caliber -- and there's two different types of calibers in this -- that I can see from the image.  One of the calibers would be a 30.06, and the other caliber would be a 30.30.

Q.  Did you seize any firearms on August 3rd that would utilize that -- either of those calibers of ammunition?

A.  No, we did not.

Q.  If you could turn to the next page.  Again looking at Exhibit 2, what are we looking at on this final page?

A.  This is a loaded Smith & Wesson magazine for a pistol.

Q.  Did you seize any Smith & Wesson pistols on August 3rd?

A.  No, we did not.

Q.  Through your execution of the search warrant on August 3rd, was there any evidence of drug abuse that you saw in the residence that day?

A.  Yes.

Q.  Were there empty wrappers of any sort?

A.  Yes, empty wrappers or packaging of THC or marijuana-based products such as gummies.

Q.  What did you mean by "gummies"?

A.  Gummies is one particular type of marijuana-based THC product similar -- it looks similar to candy that a child would eat.

1   Q.   Were any Oxycodone pills seized from the house?

2   A.   Yes.

3   Q.   How many?

4   A.   Exact number, I'd have to refer to my affidavit.

5   Q.   If your complaint indicated there were approximately 11

6   Oxycodone pills, would that sound accurate to you?

7   A.   Yes.

8   Q.   Thirteen amphetamine pills, do you recall those being

9   seized on August 3rd?

10  A.   Yes.

11  Q.   Were there any additional pills seized from the house that

12  day?

13  A.   Yes.

14  Q.   What were they?

15  A.   There was a particular set of pills that we were unable to

16  identify on their face.  Our database just could not come up

17  with anything based on their appearance.  So they're pending

18  lab results.

19  Q.   Now, were these items, the Oxycodone or the amphetamines,

20  were they in a prescription bottle with a label showing that

21  they'd been prescribed by a doctor?

22  A.   No, the pills were packaged in a manner consistent with the

23  illegal distribution of them.  So, for example, in this

24  particular case, it was like a plastic sandwich baggie corner

25  when we describe a plastic sandwich bag where it's turned into

1    a knot and the pills are in a plastic bag.

2    Q.  We've talked about this a little bit.  In the PS3, I

3    believe it indicates that Mr. Canary was renting the Cyprus

4    Street in Newport Beach residence for the last two years, and

5    had been living at ███████████████ in the several years

6    prior to that.

7        Just -- have you had the opportunity to review BMV

8    documents?

9    A.  Yes.

10   Q.  Okay.  I'd like to ask you about some of those.  Do you

11   know where -- actually, pardon me, if Mr. Canary has a current

12   driver's license?

13   A.  Yes, he does.

14   Q.  In what state?

15   A.  Indiana.

16   Q.  Is there an address associated with -- a residence, pardon

17   me, associated with that Indiana driver's license?

18   A.  Yes.

19   Q.  What is that?

20   A.  ███████████████.

21   Q.  And if you know, when did Mr. Canary apply for that Indiana

22   driver's license?

23   A.  I would have to refer to the license, to the actual

24   specific date.

25           MS. BRADY:  Your Honor, may I approach the witness?

1    THE COURT:  Yes.

2  BY MS. BRADY:

3  Q.  Handing you for identification Government's Exhibit 3, if

4  you could just review that, take a moment and let me know when

5  you have had the opportunity to take a look.

6  A.  Okay.

7  Q.  Retrieving Exhibit 3 for identification, having had the

8  opportunity to review that document, have you been able to

9  refresh your memory as to when Mr. Canary obtained that Indiana

10  driver's license?

11  A.  Yeah, July of 2019.

12  Q.  Is that a current license now?

13  A.  Yes.

14  Q.  Now, is it correct that Mr. Canary previously held a

15  California license?

16  A.  Yes.

17  Q.  Was that license issued July of 2015?

18  A.  Yes.

19  Q.  Did it expire June of 2018?

20  A.  Yes.

21  Q.  Did that demonstrate a residence in Eureka, California?

22  A.  Yes.

23  Q.  Now, it appears that the source of the information in the

24  PS3, as far as residence and specifically current residence, is

25  in part Angela Wild; is that correct?

1    A.   Yes.

2    Q.   Do you know Angela Wild?

3    A.   Only spoken with her on the phone.

4    Q.   Okay.  Have you had the opportunity to review her BMV

5    history?

6    A.   Yes.

7    Q.   Does Ms. Wild currently have a Indiana driver's license?

8    A.   Yes.

9    Q.   Does that demonstrate her current residence as reported to

10   BMV?

11   A.   Yes.

12   Q.   What is that residence?

13   A.   ███████████████.

14   Q.   Does -- through your investigation, do you know if Angela

15   Wild has any prior California licenses?

16   A.   Yes.

17   Q.   Do you know the residence listed in Ms. Wild's prior

18   California residence?

19   A.   Yes, it's in the city of Laguna Niguel.

20   Q.   Not Newport Beach?

21   A.   No.

22   Q.   I'd like to ask just a few questions about your affidavit

23   at Exhibit 1.  You indicated that five vehicles I believe you

24   said were seized from the Newport Beach residence yesterday?

25   A.   Yes.

Q.  What about the other three vehicles?

A.  The other three vehicles we believe to be here in Indiana.

Two of the three we have a strong certainty that they're here

in Indiana.

Q.  Did you look for them at Creekside?

A.  Yes.

Q.  Were they there?

A.  No.

Q.  Okay.  Looking at -- I'm sorry, let me back up.

    Do you know who currently has possession of those vehicles?

A.  No, I do not.  I spoke with Angela Wild regarding the

possession and she stated that the two Ford F350 trucks were

being driven by friends.  And that the Bentley had been sold a

few months back, but the title was not released to that person.

Q.  Okay.  Did you have any names from that conversation?

A.  No, I did not.

Q.  Finally, Exhibit 46 of your August 22nd affidavit that's

been admitted as Exhibit 1, you discuss a 2005 Ford GT that has

an estimated value of approximately $250,000.  As indicated in

the affidavit, you have been looking into that vehicle; is that

correct?

A.  Yes.

Q.  In addition to what is contained in Exhibit 46, have you

since learned any additional information that would further

support your belief that this vehicle is, in fact, Nathan

1   Canary's vehicle, not the individual who appeared to have

2   purchased it for $500 from Benjamin Canary?

3   A.   Yes.

4   Q.   What information is that?

5   A.   Yesterday I went to speak with a salesman at Coast to Coast

6   Imports who stated that he had stored and at the same time that

7   the vehicle was being stored attempted to sell the vehicle on

8   consignment on behalf of Nathan Canary, which I asked a

9   follow-up question of him:  Does this vehicle belong to Ben

10  Canary or Nathan Canary, and he stated the vehicle belonged to

11  Nathan.

12  Q.   That was his understanding?

13  A.   Yes.

14  Q.   Through your investigation, would this person have been in

15  a position to -- had he ever had a business relationship with

16  Nathan Canary, the defendant before the Court?

17  A.   Yes, he had stated he had sold him several cars.

18          MS. BRADY:  I have no other questions.  Thank you.

19          THE COURT:  Cross-examine.

20                      **CROSS EXAMINATION**

21  BY MR. MOUDY:

22  Q.   Agent, in the course of your investigation -- excuse me, in

23  the course of going to the Creekside residence, you seized a

24  number of items; correct?

25  A.   That's correct.

Q.   One of those items was a jewelry box?

A.   Yes.

Q.   Do you recall going through that jewelry box?

A.   Yes.

Q.   And did you find a passport in that box?

A.   I do not recall a passport.

Q.   Do you remember a foam insert in the jewelry box?

A.   Yes.

Q.   Do you remember -- did you, I guess, pull the insert out?

A.   No, I did not.

Q.   But you -- your office is in possession of that jewelry box?

A.   Yes.

Q.   Okay.  So if I told you that -- or if we assume that a passport is underneath that foam insert, is it safe to say that you are in possession of a passport if it, in fact, is in that jewelry box?

A.   If it is, in fact, in the jewelry box, yes.

Q.   Thank you.  Now, when you got to the Creekside residence, Nathan was generally compliant?

A.   Yes.

Q.   He didn't fight physically?

A.   No.

Q.   He may have invoked his Fifth Amendment, but -- and may have not told you everything you wanted, but generally wasn't

1  combative?

2  A.  No.

3  Q.  Okay.  He went with you that night or was taken into

4  custody that night?

5  A.  Yes, by Marion County Sheriff's Department.

6  Q.  Okay.  Were you the author of the warrant that led to the

7  Creekside residence search?

8  A.  Yes, I was the -- or excuse me, was the affiant for the

9  search.

10  Q.  At the Creekside residence?

11  A.  I was not.

12  Q.  Who was?

13  A.  That would have been our task force officer, Kyle Freeman,

14  I believe.

15  Q.  Is he part of Homeland Security?

16  A.  Yes.

17  Q.  So are you familiar with that affidavit?

18  A.  Yes.

19  Q.  And was that based on information that was garnered at the

20  airport that night?

21  A.  Yes.

22  Q.  Exclusively?

23  A.  No, not just at the airport that night.

24  Q.  So there was an investigation prior?

25  A.  There had been a previous encounter with Mr. Canary that I

 1   believe is mentioned in the affidavit.

 2   Q.   Had your office been investigating him since?

 3   A.   During that previous encounter, that's, to my knowledge,

 4   the extent of my office's investigation into Mr. Canary.

 5   Q.   Okay.   In the course of your investigation, did you come

 6   across a business named HercuLean Meal Prep?

 7   A.   Yes.

 8   Q.   All right.   Are you familiar with that business?

 9   A.   I am.

10   Q.   Would you, in your training and experience, consider that a

11   legitimate business?

12   A.   Yes, it's a —— it's a —— it's open for business.

13   Q.   Sure.   Have you ever been to a location?

14   A.   I went to one, yes.

15   Q.   Which one?

16   A.   I went to the one downtown.

17   Q.   All right.   At the Bottleworks, correct?

18   A.   Correct.

19   Q.   All right.   Do you know of other locations?

20   A.   Yes.

21   Q.   And where are they?

22   A.   I'm aware of the other location off of 82nd Street.

23   Q.   Like between Castleton and Keystone, right?

24   A.   Correct.

25   Q.   Okay.   And are you aware of the new location that they're

1   opening?

2   A.   Yes, Mr. Canary made mention of that.

3   Q.   Would you agree that in the course of your investigation,

4   you found Mr. Canary, Nathan, to be a co-owner of that

5   business?

6   A.   Yes.

7   Q.   All right.   One moment, Your Honor.

8        One last question:   The automobiles and things that have

9   been seized −− and I know that was just yesterday?

10  A.   Correct.

11  Q.   −− have you done any financial investigation into those?

12  A.   Into the vehicles specifically?   Yes, there's been some

13  preliminary financial investigation done.

14  Q.   And did you find that a number of those vehicles had liens

15  on them or money owed to a loan?

16  A.   Yes, there was a few.

17  Q.   Okay.   And I believe, and certainly correct me if I'm

18  wrong, but on the one that −− on the automobiles, some of the

19  automobiles that say there was no financial information, there

20  could be an outstanding loan, it's just that you didn't know at

21  the time of that report, correct?

22  A.   Correct.

23  Q.   Okay.

24           MR. MOUDY:   I have no further questions.

25           THE COURT:   Redirect?

1          MS. BRADY:  No.  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Any other witnesses from the government?

4          MS. BRADY:  No, thank you, Your Honor.

5          THE COURT:  Any other evidence from the government?

6          MS. BRADY:  No, Your Honor.

7          THE COURT:  Mr. Moudy, would you like to present

8     evidence either formally or by proffer?

9          MR. MOUDY:  I don't have any evidence, just an

10    argument, Your Honor.

11         THE COURT:  That concludes the evidence.  So we'll

12    move to argument, first Ms. Brady and then Mr. Moudy.

13         MS. BRADY:  Yes, thank you, Your Honor.

14         Your Honor, as we have agreed, there is a presumption

15    in favor of detention in this case.  Respectfully, I don't

16    believe that presumption has been rebutted, and I believe that

17    the additional evidence that we have presented further confirms

18    that the presumption should be applied in this case, and that

19    there are no conditions or combination of conditions that will

20    either assure Mr. Canary's appearance at future hearings or

21    safeguard the community.

22         I'm looking at the factors, the number of factors that

23    are to be applied.  The nature and circumstances of the

24    offenses charged in this case in (g)(1), 3142(g)(1), both a

25    crime involving a controlled substance and two crimes involving

1   firearms are charged in this case.

2        The weight of evidence against the person, factor

3   (g)(2), certainly I think from the evidence before the Court,

4   the weight of the evidence is very strong.  As indicated not

5   just in the complaint but also in the seizure warrant, I

6   believe at paragraph 15 of the seizure warrant, currently there

7   is a charge of zero to five-year marijuana charge indicated in

8   paragraph 15.

9        There are at least -- there is at least one informant,

10  if not more, one that's referenced in the affidavit

11  demonstrating that this has been going on for a very long time.

12  I believe in paragraph 15, it indicates that there have been

13  hundreds of pounds of marijuana that have been coming into our

14  district for a number of years on an every other week basis.

15  And I think that evidence, that belief from the informant was

16  further corroborated by the evidence that we heard today.

17       Looking at the history and characteristics of

18  Mr. Canary, I think this is difficult in that in this

19  particular case, and this is absolutely no knock whatsoever on

20  Pretrial Services, I think they were given inadequate

21  information in order to complete a full report that would be

22  necessary for Your Honor to evaluate a number of the factors,

23  including financial resources, including employment, et cetera.

24       What we know from the PS3 is that assets were listed

25  from the defendant.  There's no mention of any vehicles,

although we know from the uncontroverted evidence that was

presented in the seizure warrant, there are a number of

vehicles that certainly at the time this PS3 was drafted were

available to Mr. Canary.  Three of these vehicles are still out

there somewhere subject to seizure, but then as we heard

briefly from Agent Selby, there's another significantly

expensive vehicle that is out there and potentially available

to Mr. Canary as well, but we simply don't know.

There are a number of contradictions and omissions

from this report.  It indicates that he is making 29,000 in

business income, but I would just respectfully invite the

Court's attention, this is just simply based on what he says.

There's been no confirmation, independent confirmation through

Pretrial Services that has been able to be completed at this

point.

But in looking at these factors, the ones that we can

speak to, with any reasonable certainty, we can look at these

factors and they weigh in favor of detention.  Looking at the

physical and mental condition or substance abuse, I think the

PS3 report is very clear.  There is a longstanding and a very

significant substance abuse issue.  Most recently April of this

year, there's an arrest that he's currently pending trial back

in Newport Beach for driving under the influence and driving

with a blood alcohol content of .08 or more, but we also know

that it does not appear that alcohol is the only substance

1   abuse that the Court should be concerned with.

2        There were a number of pills of amphetamine.  There
3   were a number of pills of Oxycodone that were seized from the
4   residence.  Obviously as the Court's well aware, these are
5   extremely addictive and addicting substances.  So in looking at
6   that factor, I think certainly there is significant cause for
7   concern.

8        In looking at the length of residence in the
9   community, I don't know that that's clear.  With respect to
10  what's in the PS3, the BMV documents tend to belie that.

11       There was an indication that there were these two
12  addresses -- Cyprus lane in Newport Beach and here at
13  Creekside -- are the only two residences that were claimed in
14  the past several years, going back two years and then several
15  years before that, but we know from the BMV records that there
16  are additional residences out in California, Eureka, Laguna
17  Niguel.  So that's certainly a cause for concern.

18       Looking at the past conduct or criminal history, Your
19  Honor, in this case, there are two prior dealing in marijuana
20  convictions, one of which was a federal conviction from the
21  Western District of New York.

22       So will conditions of release ensure that this
23  apparently incredibly lucrative business will just stop while
24  we're pending trial?  I think that's a very difficult
25  assessment to make that that is possibly true, particularly in

1  light of the fact that Mr. Canary has already twice sustained

2  felony convictions for dealing in marijuana.

3       I think that speaks very loudly as to what Mr. Canary

4  intends to do.  He intends to continue to deal in marijuana.  I

5  don't know how he could say that more strongly to this Court of

6  the members of this community.

7       There is one factor in favor of his release, the lack

8  of recent failures to appear.  I think his most recent failure

9  to appear was some time ago back in '07; but again, I think in

10  looking at the overall criminal history, what is very clear is

11  there is an individual who has a significant substance abuse

12  problem and has a significant will to sell marijuana at

13  tremendous amounts in this community and elsewhere.

14       And then finally, looking at whether at the time of

15  the current arrest the person was on conditions of release

16  elsewhere, and of course in this case, he was.  As previously

17  mentioned, just this year he was arrested for that DUI and he's

18  still pending that case in California.

19       Looking at the nature and seriousness of this offense,

20  to be clear, I think you look at the lead charge, the zero to

21  five year marijuana case.  And even assuming that these

22  thousands of pounds of historical dealing will be ignored by

23  the government and no more serious charges will be filed in the

24  future, even assuming that, due to Mr. Canary's criminal

25  history, even the charges that are before the Court here are

1   significant.

2          Of course, there's the five-year mandatory minimum

3   with the 924(c) charge that has been filed by the grand jury,

4   but there's also, just looking at the guidelines, Mr. Canary on

5   the face of his criminal history appears to be a career

6   offender under 4B1.1, which obviously has very significant

7   impact on the guideline.

8          Looking at just the 922(g) count and the guidelines at

9   2K2.1, those guidelines alone are significant.  He appears to

10  be at a base offense level 26 with another six levels of

11  clearly applicable enhancements ending him at an offense level

12  32, which would at least be, if my math is correct, at least

13  210 to 262 month guidelines range, just for the 922(g).

14         So in light of all of these factors, Your Honor, we do

15  believe that we have held and surpassed our burden to

16  demonstrate that Mr. Canary would be a danger to this community

17  as well as a flight risk if released, and we would respectfully

18  request his detention in this matter.  Thank you.

19         THE COURT:  Thank you.  Just to clean up a little bit

20  here, you referenced an Exhibit 3 during the presentation of

21  evidence.  Just to make sure, you're not offering that?

22         MS. BRADY:  Correct, Your Honor.  I simply would make

23  that part of the record in terms of just that was to refresh

24  the witness's recollection.

25         THE COURT:  Thank you.

1          Mr. Moudy, your argument, please.

2          MR. MOUDY:  Thank you, Your Honor.

3          First, I'd like to address the government's argument

4   that there are potentially funds and assets available to

5   Mr. Canary simply because the government cannot account for

6   them now.

7          As the Court is well aware, we are dealing with the

8   federal government.  If there is any kind of transaction or

9   deposit or purchase at all by Mr. Canary, they're going to know

10  about it.  I'm sure Your Honor and I know myself have sat

11  through many a forfeiture argument where the forensic detail of

12  bank records and transactions and purchases are well documented

13  by the government and their agents.  So to argue that there's

14  this boogie-man of assets out there, I'm not entirely sure is

15  fair and accurate.

16         I think the one thing that -- one of the things that

17  we can learn from this PS3 is that while Nathan has been in and

18  out of court throughout his life, this is certainly one of the

19  rare times where we see no probation violation.  We see no

20  revocations, and while there is a failure to appear from 2007,

21  that case was ultimately dismissed.

22         So if given a set of instructions or a confinement or

23  restrictions, it is evident that Nathan can abide by

24  instructions given to him from the Court.  Now I don't pretend

25  to know everyone out here, but I am certainly willing to bet

1    that 90 percent of them are here for Nathan Canary, and I think

2    that that support network does demonstrate that together,

3    regardless of any court restrictions, that together they can

4    ensure that Nathan doesn't miss a court date.

5          Certainly I know that he will remain in contact with

6    me, but what I also think is important to demonstrate to the

7    Court is that he has a lot to lose if he doesn't abide by your

8    release conditions.

9          He is asking to get out on release conditions, Your

10   Honor, not simply so that he's not in custody, but so that he

11   can spend time with his daughter, who is here, and his mother,

12   father, all of his family, everybody that you see out there,

13   and those moments are precious to him, and that is why we are

14   asking for release.

15         Now, I don't think it's fair to argue that because

16   perhaps the government didn't like probation's recommendation,

17   that they didn't have all of the information.  I didn't either

18   when we came in here today as the Court held -- you set

19   discovery deadlines that certainly were for today.  So it's all

20   new and we're arguing from what we learned today.

21         But I think one of the things that probation did take

22   into consideration is my client's past history.  And that

23   history, along with some other factors, cause them to recommend

24   release with a number of conditions that are listed, none of

25   which we have a problem with, but we would also offer that

1    Nathan could be placed on home detention, confined to his

2    house.  The government knows where he is.  Probation knows

3    where he is?  He's doing drug testing.  And that that is

4    enough, especially demonstrated by his criminal history, to

5    ensure that he is not a danger to the community and to ensure

6    that he does not miss a court date.

7              In addition, there was testimony from the agent that

8    my client is a business owner that has two locations, and one

9    soon to open.  My point being he has employment, and so he

10   could be working and would be working if released from custody.

11             I think it's also necessary to point out, Your Honor,

12   that his criminal history has no signs of violence.  There are

13   no former gun charges as well.  And I think that with that

14   understanding, with his family here, the fact that he has

15   property and a residence and family in the Southern District of

16   Indiana, I think that that does give enough information to the

17   Court to set reasonable conditions that do not include being in

18   custody.

19             Thank you.

20             THE COURT:  Thank you.

21             Miss Brady, any follow-up argument?

22             MS. BRADY:  Just very briefly, Your Honor.  I do

23   recognize that there is a support network.  Unfortunately, that

24   clearly did not prevent the criminal conduct, the extensive

25   criminal conduct that we've seen has clearly been going on

right under the family's nose.  Could he be confined to his

home?  Your Honor, his home is where this business -- was the

epicenter of this illegal business.  There were drugs, there

were guns, there was almost a hundred thousand dollars in cash,

and there were any number of drug ledgers.  So his home is

where he was already committing this criminal conduct.

Can he abide by conditions?  I dare say in Newport

Beach when he was released on that DUI, he was told "Don't

commit any more crimes," and yet here we are today.  So

respectfully, I would disagree that he can abide by conditions.

That's all I had, Your Honor.

THE COURT:  Any response argument, Mr. Moudy?

MR. MOUDY:  No, there's no response other than to

point out that my client is in AA.  That's all I would add.

THE COURT:  We begin with the federal statute that

instructs me to presume that Mr. Canary should be detained, and

that is unless a presumption is sufficiently rebutted or

rebutted by sufficient evidence, and I find that the

presumption has not been sufficiently rebutted.

Going further beyond that, which I don't need to do,

but considering the evidence and arguments, I find that there

is no condition or combination of conditions that will

reasonably assure the safety of the community in general were I

to release him.  And the government has met its burden of proof

on this issue by clear and convincing evidence.

1    So he shall remain in the custody of the United States

2 Marshal.  I'll issue a written detention order and that will

3 conclude the hearing.  Thank you.

4                    (Court adjourned at 3:32 p.m.)

5

6 ********************************************************************

7                CERTIFICATE OF COURT TRANSCRIBER

8

9

10    I, Laura Howie-Walters, hereby certify that the

11 foregoing is a true and correct transcript prepared to the best

12 of my ability from previously recorded proceedings in the

13 above-entitled matter.

14

15

16 /S/LAURA HOWIE-WALTERS    October 7th, 2021

17 LAURA HOWIE-WALTERS, FCRR, RPR, CSR
   Official Court Reporter
18 Southern District of Indiana
   Indianapolis Division
19

20

21

22

23

24

25